IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| HW PREMIUM CBD, LLC, AJ's HEALTH AND WELLNESS d/b/a American Shaman, E. KRIEGER LAND, LLC d/b/a Greene Goods Market & Greenhouses, GREEN ONYX INC. d/b/a Your CBD Store, BEYOND CBD, LLC d/b/a Beyond CBD, CAMPBELL'S NUTRITION CENTERS, INC., TCI ENTERPRISE INC. d/b/a Sky High, ICANNA, LLC, YOUR CBD STORES FRANCHISING LLC, | ) ) ) ) ) ) ) ) ) ) | Case No. 4:24-cv-00210-SMR-SBJ |
| Plaintiffs, | ) ) ) | ORDER ON MOTION FOR PRELIMINARY INJUNCTION |
| v. | ) ) ) | |
| KIM REYNOLDS, Governor of Iowa in her official capacity, KELLY GARCIA, Director of Iowa Department of Health and Human Services in her official capacity, STEPHAN BAYES, Commissioner of Iowa Department of Public Safety in his official capacity, MIKE NAIG, Secretary of Iowa Department of Agriculture in his official capacity, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Congress legalized industrial hemp in the 2018 Farm Bill to permit wider use of the crop. The federal law requires states to submit plans outlining how any subsequent hemp programs within their jurisdiction would function. Many states did just that and the hemp industry throughout the country expanded rapidly. As a likely unforeseen consequence of the Farm Bill, consumable hemp products were legalized and grew in popularity. States across the country have responded to the proliferation of these intoxicating products with legislative efforts to reign in their potency and widespread availability.

1

The Iowa legislature passed one such law in May of this year, which contained numerous provisions regulating the consumable hemp industry in the state.  Among these provisions are potency limits, warning label requirements, age minimums, and the prohibition of synthetic consumable hemp products.  The rollout of the law has been less than optimal, occurring on a compressed timeline of approximately six weeks between its enactment and its effectiveness and bringing with it all the attendant complications rushed legislation often creates.

## I.     BACKGROUND

The general factual and statutory background was extensively discussed in the Court's order filed July 2, 2024 in a companion case.  *Climbing Kites v. Garcia*, 4:24-cv-00202-SMR-SBJ (S.D. Iowa July 2, 2024) ("*Climbing Kites*").  Therefore, this summary will be brief.  In this case, Plaintiffs are eight companies who participate in Iowa's consumable hemp industry by cultivating, manufacturing, distributing, and/or selling hemp and hemp-derived products in and out of Iowa.

Plaintiffs initiated this case on June 25, 2024, seeking to enjoin the implementation of House File 2605 and House File 2641 (collectively, "Hemp Amendments") before the July 1, 2024 effective date.  [ECF No. 1].  They moved for a Temporary Restraining Order ("TRO") and a preliminary injunction on the basis that the Hemp Amendments violate multiple provisions of the United States Constitution.  [ECF No. 2].  The TRO request was denied on June 26, 2024 and a status conference was set for June 28, 2024.  [ECF Nos. 8; 10].  At the status conference, a briefing schedule was set along with a hearing on the pending Motion for Preliminary Injunction.  [ECF No. 19].  The hearing on the preliminary injunction motion was combined with the same in the *Climbing Kites* case.  Plaintiffs presented a comprehensive argument at the hearing, including setting forth the multiple bases on which they believed the Hemp Amendments were invalid.  The Court directed an additional round of post-hearing briefing to further expand on issues that arose

shortly before and during the hearing.  After the hearing, there were material developments regarding the implementation of the law, which are discussed in greater detail below.

## II.     DISCUSSION

### A.  Preliminary Injunction Standard

Preliminary injunctive relief is an extraordinary remedy that is not issued routinely or "as a matter of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)).  The main purpose of a preliminary injunction is to preserve the status quo and prevent irreparable harm until the court can make a final decision on the merits. *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984).  "A plaintiff seeking a preliminary injunction bears the burden of showing that such extraordinary relief is warranted." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (citation omitted).

At this early stage of the case, the Court weighs four factors in determining whether to issue a preliminary injunction: (1) Plaintiffs' probability or likelihood of success on the merits of the claim; (2) the threat of irreparable harm or injury to Plaintiffs absent preliminary relief; (3) the balance of equities, weighing the harm suffered by Plaintiffs against the harm to Defendants that would result from issuing an injunction; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

Although no individual factor is dispositive, the Eighth Circuit has held that probability of success "is the most significant." *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (citation omitted).  When a party seeks to enjoin the enforcement of a duly enacted statute, they must show that they are "likely to prevail on the merits" of the claims. *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (citation omitted).  Courts apply a heightened standard

in that circumstance "because the duly enacted state statute constitutes government action based on presumptively reasoned democratic processes, and such action is entitled to a higher degree of deference and should not be enjoined lightly." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019) (cleaned up) (citation omitted).  The heightened standard is applied not only to statutes but also regulations.  *Sleep Number Corp.*, 33 F.4th at 1016 ("[T]he more-likely-than-not standard is reserved for injunctions against the enforcement of statutes and regulations[.]") (citation omitted).  The Eighth Circuit has held that the likely to prevail on the merits standard applies when "a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).

A plaintiff is not required to establish with absolute certainty that irreparable harm will occur, but it must show that "irreparable injury is likely in absence of an injunction." *Winter*, 555 U.S. at 22.  Failure to show irreparable harm is an "independently sufficient basis upon which to deny a preliminary injunction." *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (citation omitted).  When balancing the equities of a preliminary injunction courts weigh "the threat of irreparable harm shown by the movant against the injury that granting the injunction" will cause to the other party's litigant. *MPAY Inc. v. Erie Custom Comp. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (cleaned up) (citation omitted).

### B.  Likelihood of Success on the Merits

Plaintiffs argue that the Hemp Amendments violate the Supremacy Clause, the Due Process Clause, the dormant Commerce Clause, and the Takings Clause of the United States Constitution. The Supremacy Clause is invoked in Count I and Count II where Plaintiffs argue that the law is expressly preempted by the 2018 Farm Bill and there exists a conflict preemption between the two

laws.  Plaintiffs' due process challenges come in the form of a void for vagueness claim in Count III, and in Count IV they argue that the law is "void" because of the abbreviated time period between passage of the Hemp Amendments and their effective date.  The claim in Count V dovetails with Plaintiffs' express preemption claim where they argue that the Hemp Amendments unconstitutionally interfere with interstate commerce in certain respects.  Finally, Count VI asserts that the law regulating consumable hemp products amounts to a taking under the Fifth Amendment requiring just compensation from the state.

### 1.   Preemption Claims

Plaintiffs first challenge the Hemp Amendments on the grounds that they are preempted by federal law.  Federal preemption of state statutes and regulations is grounded in the dictates of the Supremacy Clause.  U.S. Const. art. VI, cl. 2 (providing that federal law is "the supreme Law of the Land").  For more than 200 years, the United States Supreme Court has recognized that state laws which interfere with or are contrary to the laws of Congress must yield to federal law.  *See Gibbons v. Ogden*, 22 U.S. 1, 9 (1824).  However, there is a presumption against preemption when the law in question touches on the traditional police power of state governments.  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).  In that situation, Congress must clearly spell out its intent when it passes a law to preempt state law.  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (holding that "the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress").  On the other hand, the presumption against preemption is "not triggered when the State regulates in an area where there has been a history of significant federal presence."  *United States v. Locke*, 529 U.S. 89, 108 (2000).  Congressional intent is the ultimate touchstone when assessing the preemptive effect of a statute.  *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990).

Federal preemption comes is three different varieties.  The first way that Congress may preempt state law is by expressly saying so.  *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977).  Aside from express language in a statute, "Congress may indicate pre-emptive intent through a statute's . . . structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (citing *Rath Packing*, 430 U.S. at 525).  When Congress has expressly preempted state law, "[t]here should be no presumption against pre-emption." *Id*.

In the absence of express preemptive language, courts have recognized different versions of implied preemption, such as conflict preemption.  Conflict preemption "occurs when it is impossible for a private party to comply with both state and federal law, and when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of federal law. *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000)) (cleaned up).

The other form of implied preemption is what is known as field preemption.  Field preemption is when "federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation." *Murphy v. NCAA,* 584 U.S. 453, 479 (2018) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)).  Where federal law occupies an entire field in this manner, "even complementary state regulation is impermissible." *Arizona v. United States*, 567 U.S. 387, 401 (2012) ("Field preemption reflects a congressional decision to foreclose any state regulation in an area, even if it is parallel to federal standards.").

The Supreme Court has admonished that the "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts

that pre-empts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted).

### a.   Standing for Express Preemption

"Under Article III, a case or controversy can exist only if a plaintiff has standing to sue— a bedrock constitutional requirement."  *United States v. Texas*, 599 U.S. 670, 675 (2023).  To establish standing, a challenger must show he or she: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs who claim a "risk of future harm" may seek "forward-looking, injunctive relief to prevent the harm from occurring" but only if "the risk of harm is sufficiently imminent and substantial." *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021)).  Standing doctrine "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982). It could not be more clearly established that Plaintiffs must have standing for each of their claims.

Plaintiffs' express preemption claim is rooted in the Farm Bill's directive that states may not "prohibit" the transportation or shipment of hemp or hemp products through the state.  7 U.S.C. § 1639o note.  Because Plaintiffs' preemption claim emerges out of a restriction on the interstate transportation of hemp through the state, they must allege an imminent risk of injury.  While Plaintiffs are largely Iowa companies in the business of manufacturing or selling hemp products within the state, several of them are based out of other states, receive products from other states, or ship products out of Iowa.  [ECF No. 3-1 at 45, 50, 100].  Plaintiffs need only to establish one

of them has standing to press their express preemption claim. *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 668 (8th Cir. 2022) ("Constitutional standing requires that at least one plaintiff demonstrate" a traceable, redressable injury).

One essential requirement of standing, which is not currently present for purposes of the express preemption claim, is that a plaintiff must have an injury arising from the government action. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020) (discussing that a plaintiff must have "suffered an injury in fact that is concrete, particularized, and actual or imminent."). The injury must be concrete, which is an injury that is "'*de facto*'; that is, it must actually exist." *Spokeo*, 578 U.S. at 340. This element of standing is of equal force on pre-enforcement review. *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015) ("When a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.").

Applying this standard, none of the Plaintiffs have standing to assert an express preemption claim because they do not plead that they are at risk of an injury arising from the lack of exemption for interstate transportation in the Hemp Amendments. The Farm Bill explicitly prevents states from prohibiting the transportation and shipment of federally compliant hemp products *through* the state. However, there are no allegations or affidavits that support any of the Plaintiffs do, in fact, transport prohibited products through Iowa. Rather, they allege that they manufacture consumable hemp products in Iowa and ship them out of state, manufacture products outside of Iowa and ship them into the state, and that they transport such products within the state. None of these activities are expressly preempted by the Farm Bill, which only preempts states from

prohibiting the transportation or shipment of hemp or hemp products through the state.  7 U.S.C. § 1639o note.

Guided by the plain language in the Farm Bill and the interpretation of other courts who have considered express preemption claims on these grounds, the Court finds this to be the proper application of the preemption provision.  *See C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020); *N. Va. Hemp & Agric. LLC, v. Virginia,* 1:23-cv-1177 (LMB/IDD), 2023 WL 7130853, at *5 (E.D. Va. Oct. 30, 2023); *Duke's Invs. LLC v. Char*, CIV NO. 22-00385 LEK-RT, 2022 WL 17128976, at *7 (D. Hawaii Nov. 22, 2022).  In *C.Y. Wholesale, Inc,* the Seventh Circuit applied the preemption provision the same way when analyzing an Indiana state law that criminalized the possession of smokable hemp without an exception for interstate transportation as required in the Farm Bill.  965 F.3d at 547.  The panel held that because the preemption provision in the federal law covers the interstate transportation of hemp products, an injunction addressing "only transit through the state, along with ancillary restrictions on the possession and delivery of smokable hemp to the extent that those provisions interfere with that transit, is the most that would have been warranted on express preemption grounds."  *Id*.  The express preemption provision identified by Plaintiffs in the Farm Bill covers only the transportation and shipment of hemp products through the state, not the import, export, or intrastate transportation of those products.

Vague statements made in the Complaint and corresponding affidavits that under the Hemp Amendments, Plaintiffs "will be prohibited from even transporting [their] manufactured consumable hemp products through Iowa;" "had to implement new operating procedures to transport goods to states that do not require [them] to enter through the State of Iowa;" and that "the restrictions on the shipment of hemp through Iowa . . . will affect [their] ability to ship [their]

hemp products to different states;" do not establish that they are at risk of an injury or that such an injury would be redressable.  [ECF Nos. 1 ¶ 85; 3-1 ¶ 14; 30-1 ¶ 18].  There is no specific allegation that Plaintiffs are engaged in the interstate transportation activity required for an express preemption claim under the Farm Bill.

Plaintiffs' response to Defendants' standing argument essentially concedes as much.  They claim that one Plaintiff, Sky High, will be obligated under the Hemp Amendments "to transport, store, and sell its product outside of Iowa and will be prohibited from even transporting its manufactured consumable hemp products through Iowa."  [ECF No. 30 at 3].  Crucially, the affidavit submitted by Sky High does not claim to transport non-compliant products through Iowa.  Thus, Sky High may be prohibited from transporting prohibited products in the state in the same way that everyone is prohibited under the Hemp Amendments.  But that is not enough for standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992) (stating that an injury is particularized if it affects the plaintiff in a personal and individual way).

Plaintiffs point to no other Plaintiff who expressly claims to engage in transportation of consumable hemp products through the state.  Rather, the crux of their argument is that they "ship product out of Iowa" and "into Iowa."  [ECF Nos. 3 at 14; 30 ¶ 4].  They complain that they cannot ship products out of the state "even as a 100% online retailer."  *Id*.  Not only does moving consumable hemp products out of or into the state not fall under the transportation clause of the Farm Bill, but Plaintiffs have another problem—in order to export their non-compliant products out of the state or import them in, they must necessarily possess them within the state.  The preemption clause of the Farm Bill cannot and does not function as a clause that enables the possession of any non-complaint product to permit their sale in or out of the state.  At this point,

Plaintiffs have not established standing to pursue a claim based on express preemption as none of the eight businesses properly allege that they engage in conduct covered by the provision.

> b.  Conflict Preemption

The Farm Bill contains several significant provisions that govern the relationship between the states and federal government regarding the hemp industry.  First, the Farm Bill gave the Secretary of the United States Department of Agriculture the "sole authority to issue Federal regulations and guidelines that relate to the production of hemp." 7 U.S.C. § 1639r(b).  Second, it established a framework for plan approvals which would allow participating states to have "primary regulatory authority over production of hemp" in their state.  *Id*. § 1639p(a)(1).  Third, it contains a subsection defining the Farm Bill's effect on state law.  This section contains a provision expressly disclaiming broad federal preemption: "[n]othing in this subsection preempts or limits any law of a State or Indian tribe that (i) regulates the production of hemp; and (ii) is more stringent than this subchapter."  *Id.* § 1639p(a)(3).  Additionally, although the Farm Bill requires certain mechanisms and procedures for state hemp plans, states may also "include any other practice or procedure established by a [s]tate . . . to the extent that the practice or procedure is consistent with" the Farm Bill.  *Id.* § 1639p(a)(2)(B).  Finally, the statute addresses the transportation of hemp and hemp products.  *Id.* § 1639o note.

"Hemp" as defined in the Farm Bill "means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."  *Id*. § 1639o(1).  The Farm Bill does not provide a definition of hemp products.  However, courts that have construed this provision have found that "hemp products" would include any products which are made with "hemp" as

defined in the Farm Bill.  *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 691 (9th Cir. 2022); *C.Y. Wholesale, Inc.,* 965 F.3d at 547; *Duke's Invs. LLC v. Char*, CIV NO. 22-00385 LEK-RT, 2022 WL 17128976, at *7 (D. Hawaii Nov. 22, 2022).

Plaintiffs do not identify specific provisions of the Hemp Amendments which they argue are preempted.  Rather, they broadly assert that the Farm Bill preempts the Hemp Amendments under theories of express and conflict preemption.  As discussed above, it is unlikely that Plaintiffs have standing to bring the express preemption claim because they are not involved in the interstate transportation of hemp products through the state of Iowa.  However, Plaintiffs also allege that the Hemp Amendments are preempted because they act as an obstacle to the goals of the Farm Bill and therefore conflict with Congress' intent.

"Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives."  *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009).  Congressional intent goes to the heart of the preemption analysis.  *See Wuebker,* 418 F.3d at 886.  A conflict preemption analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Altria Grp.*, 555 U.S. at 77.  This is especially the case when the legislation is in a field which is traditionally occupied by the states.  *Id*.

"State governments historically possess police power to protect public health and safety."  *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023).  The power to regulate consumer products, such as Plaintiffs' hemp products, to promote public health and safety falls neatly within a state's traditional police powers.  *See id*.  In their argument, Plaintiffs zero in on the definition of hemp as provided in the Farm Bill and the new restrictions that the Hemp

Amendments place on the definition of "consumable hemp."  On the whole, they assert that the Hemp Amendments "run headlong into the 2018 Farm Bill's provisions, serving as an unconstitutional obstacle to the full purposes and objectives of Congress."  [ECF No. 3-1 at 14].

Unlike their express preemption claim, it is likely that Plaintiffs do have standing for a conflict preemption claim.  They are challenging the more stringent requirements placed on hemp products by the state of Iowa and do actually produce, distribute, sell, and possess those products. If the law was impliedly preempted by the Farm Bill, Plaintiffs would stand to suffer the injury of criminal enforcement of the law traceable to the restrictions in the Hemp Amendments and redressable by the actions of the Court.  *Spokeo,* 578 U.S. at 338.  Nevertheless, Plaintiffs' conflict preemption claim is not likely to be meritorious for the reasons discussed below.

First, it is entirely possible for an individual to comply with both the Hemp Amendments and federal law.  The Farm Bill defines hemp as "the plant Cannabis sativa L. and any part of that plant . . . with a delta-9 [THC] of *not more* than .3 percent on a dry weight basis."  7 U.S.C. § 1639o (emphasis added).  Accordingly, materials and products falling under that definition were decriminalized at the federal level.  Notably, this definition does not limit hemp to exactly 0.3% THC content on a dry weight basis—it encompasses all material and product which fall below that threshold as well.  Therefore, to comply with federal law, individuals are not permitted to possess or participate in the production, transportation, or sale of the cannabis plant that exceeds the 0.3% THC limit.  As amended, individuals can comply with Iowa law by not possessing, producing, or selling hemp products that exceed the 0.3% THC limit or 4 mg of THC per serving and 10 mg of THC per container.  *See* Iowa Code § 204.2.  Iowa law directs that the cap on potency is the lesser of those alternatives.  *Id*.  Accordingly, hemp products, and specifically consumable hemp products, will never exceed the 0.3% THC limit permitted by the Farm Bill.  Under any possible

application, a person can comply with both Iowa law and federal law at the same time. This logical analysis alone fatally undermines the argument that the Hemp Amendments conflict with the Farm Bill.

Second, while requiring a more robust analysis, the Hemp Amendments do not stand as an obstacle to Congress's objectives in the Farm Bill. Congress included in the Farm Bill what is essentially an express anti-preemption clause. This is an extra precaution that serves to dispel any uncertainty about their preemptive intent and the distribution of regulatory authority in the statute. The anti-preemption clause disclaims any prohibition on, or limit to, any state regulation of hemp production merely because the law 'is more stringent' than the Farm Bill. 7 U.S.C. § 1639p(a)(3). Plaintiffs argue that this provision has no application to the conflict preemption analysis because "production" is limited to the growing or cultivation of hemp. They cite to the definitions of the federal domestic hemp production program in support. 7 C.F.R. § 990.1. There, "produce" is defined as "[t]o grow hemp plants for market, or for cultivation for market, in the United States." Plaintiffs are not the first to make this argument.

In *C.Y. Wholesale, Inc.,* the plaintiffs in that case similarly argued that the provision in the Farm Bill allowing states to regulate more stringently applied only to the growing of crops. 965 F.3d at 544. They asserted that the authority to regulate the manufacturing of hemp products was not given to the states and thus remained under the purview of the federal government. *Id*. The United States Court of Appeals for the Seventh Circuit did not directly determine whether "production" would include the manufacturing or sale of hemp and hemp products. However, the panel did find that even criminalizing smokeable hemp in the Indiana state law was permissible because states can adopt more stringent rules than that of the federal government and the "Farm Bill's lenience toward industrial hemp," did not preclude states from proscribing it. *Id*. at 548.

Likewise, in Virginia and Hawaii, the district courts found that "Congress' silence in the 2018 Farm Act on matters beyond regulating hemp production does not necessarily preclude the [state] from regulating areas in addition to hemp production." *Duke's Invs*, 2022 WL 17128976, at *5; *N. Va. Hemp & Agric. LLC, v. Virginia,* 1:23-cv-1177 (LMB/IDD), 2023 WL 7130853, at *8 (E.D. Va. Oct. 30, 2023).

Following the reasoning of these courts, even if the anti-preemption provision permitting states to regulate production more stringently does not apply to areas of the hemp production process after cultivation, the Hemp Amendments are not preempted from doing so.  There is nothing in the Farm Bill that stands for the proposition that Congress intended to preempt states from regulating any part of the hemp cultivation, production, manufacturing, or sales process, except the express preemption for interstate transportation.  Moreover, it is instructive that Congress included in the statute an express preemption provision regarding the interstate transportation of hemp and hemp products.  7 U.S.C. § 1639o note.  "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023) (discussing the traditional rule of statutory construction *expressio unius est exclusio alterius*).  If Congress had intended its definition of hemp to be the only permissible definition or to prohibit states from regulating the manufacture and sale of hemp or hemp products, it could have said so.

Finally, aside from looking exclusively at the text of the statute, it is not irrelevant to consider Congress's intent in passing the Farm Bill for the purposes of preemption.  It is illogical that Congress would have intended for states' authority to regulate hemp production to stop at the cultivation of the plant.  Plaintiffs point to the Conference Report for the Farm Bill to support their

argument that states were never intended to have authority to alter the definition of hemp as set forth in the federal law. It does not furnish the support that they believe it does.

First, it is important to note that a restriction on altering the definition of hemp never made its way into the language of the statute and courts may not narrow a provision's reach by inserting words Congress chose to omit. *See Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 770 (2019). Second, even in the context of the Conference Report, it is clear that the language proscribing an alteration to the definition of hemp is made in reference to concerns that states will regulate in a manner less restrictive than the Farm Bill. H.R. Rep. No. 115-1072, at 738 (2018) (Conf. Rep.) (clarifying that "states and tribal governments are authorized to put more restrictive parameters on the production of hemp, but are not authorized to alter the definition of hemp or put in place policies that are less restrictive than this title."). In fact, this concern that states might allow hemp production beyond the scope of permissibility in the Farm Bill is prominently featured in the statute. Specifically, it is incorporated in the definition of hemp itself—"'hemp' means the plant Cannabis sativa L. any part of that plant . . . with a delta-9 tetrahydrocannabinol concentration of not more than .3 percent on a dry weight basis." If anything, it seems clear that Congress's intent was that states be permitted to create policies and regulate the hemp industry more stringently to be sure that they never expanded hemp production beyond that designated in federal law.

Overall, Plaintiffs cannot demonstrate that the Hemp Amendments are an obstacle to the Farm Bill or that they conflict with Congress's intent. It is untenable that Congress would give states the authority to outright ban the production of hemp within their borders, while usurping from them their traditional police powers to regulate products to promote public health and safety, without even saying so. Courts should not strain to create a conflict between state and federal law

-16-

when one does not clearly exist. *English*, 496 U.S. at 90. For these reasons, Plaintiffs are not likely to succeed on the merits of their conflict preemption claim.

### 2. Due Process Claims

#### a. Vagueness

Plaintiffs argue that the Hemp Amendments fail to define certain key terms such that the law wholly fails to provide fair notice of the distinction between lawful and unlawful products. Laws that fail to provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited or lend themselves to arbitrary enforcement violate the constitutional guarantee of due process under the Fifth Amendment and Fourteenth Amendment. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). In their brief, Plaintiffs identify two portions of the Hemp Amendments which they assert are fatally vague. First, they claim that "synthetic consumable hemp product" is not defined in the statute, even though the law prohibits their sale. Plaintiffs maintain that individuals in the hemp industry "have no idea" what products would constitute a "synthetic consumable hemp product." [ECF No. 2 at 16]. Plaintiffs also argue that the labeling and packaging requirements under the Hemp Amendments are vague because, although the law required a warning to be displayed on each package of a consumable hemp product, there was no language in the law. *Id*.

As the litigation has progressed, Plaintiffs have gone on to argue that "serving" and "container" as written in the Hemp Amendments are also vague. Critically, Plaintiffs did not plead a vagueness claim concerning either of these statutory terms. Rather, they arose later in the litigation. Plaintiffs' efforts to refute this pleading deficiency, as pointed out by Defendants, is not convincing. They insist that the Complaint alleges that "[c]ritical phrases are not defined" and the Hemp Amendments are generally "vague." [ECF No. 1 ¶¶ 18, 128]. Despite alleging that these

phrases were "critical," nowhere in the Complaint do Plaintiffs expressly plead that "serving" or "container" is vague. The surrounding context of the Complaint does not support a strained reading either because it is clear that those allegations refer to the warning provision and "synthetic consumable hemp products." It is apparent that these vagueness claims are not properly before the Court. Notwithstanding this pleading infirmity, the analysis below demonstrates that the terms are not vague even if they were considered.

The vagueness issue has taken center stage in both this case and *Climbing Kites* after the issue was raised by the Court in a previous hearing. It was the principal question addressed at the July 11, 2024 hearing. On July 17, 2024, the vagueness claims changed dramatically when the Final Rules on the Hemp Amendments were immediately promulgated under the Department's emergency authority. The rules address all of the vagueness issues raised in the case. A "serving" is defined as:

> the size or portion customarily consumed per eating occasion, expressed in a common household measure as established in table 2 of 21 CFR 101.12 (as amended to July 17, 2024). If a solid consumable hemp product is packaged in a manner that includes more than a single serving, each serving must be clearly identified and severable from the other servings in the container. If a liquid consumable hemp product is packaged in a manner that includes more than a single serving, the number of servings must be conspicuously labeled. Liquid consumable hemp products shall be packaged in a container that holds a minimum of 12 fluid ounces.

Iowa Admin. Code r. 641–156.1. This provision provides notice as to what constitutes a serving for consumable hemp products. The rule directs persons to federal regulations for greater detail on serving sizes. During the July 11, 2024 hearing, the issue had been raised about the application of the serving size provision to products such as creams, ointments, oils, and other cosmetics. Because those products are not food, it was unclear how "serving" size could be determined. Defendants represent that the Department will regard these products as excluded from the

"serving" requirement of the Hemp Amendments and only the 10 mg per container requirement will apply.

The Final Rule defines "container" as "the object which holds one or more servings of a consumable hemp product." Iowa Admin. Code r. 641–156.1(204). Likewise, "synthetic consumable hemp products" are defined as:

> products containing synthetic or semisynthetic cannabinoids. Synthetic and semisynthetic cannabinoids refer to a class of cannabinoids that are created through a chemical process and are structurally similar to naturally occurring cannabinoids or cannabinoids that may occur in very small amounts naturally. Examples of synthetic consumable hemp products include but may not be limited to delta-8 tetrahydrocannabinol, delta-10 tetrahydrocannabinol, hexahydrocannabinol (HHC), tetrahydrocannabiphorol (THC-P), and tetrahydrocannabinol-O-acetate (THC-O).

Iowa Admin. Code r. 641–156.1. This definition is consistent with federal law concerning controlled substances where a "synthetic" substance is one "that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring" sources. 7 U.S.C. § 6502(22).

The warning provision that Plaintiffs argue was without substance has also been colored with more detail about what must be included on the packaging of a consumable hemp product:

> (1) A statement that the product has not been evaluated or approved by the United States Food and Drug Administration (unless such approval has been secured); (2) The potential for the product to cause the consumer to fail a drug test for THC; (3) A statement that products containing THC may cause impairment and impact a consumer's ability to operate a vehicle; (4) A statement that the product is not recommended for use by pregnant or breastfeeding women; (5) A statement that product use may result in health risks and medication interactions; and (6) A statement in capital letters to KEEP THIS PRODUCT OUT OF REACH OF CHILDREN.

Iowa Admin. Code r. 641—156.4(1)(*j*).  Beginning on July 17, 2024, registrants must "take reasonable steps to comply" with the warning provision.  [ECF No. 37-7 at 1].  The Final Rules give notice to a person of ordinary intelligence regarding what is prohibited and sets sufficient standards to enforce those prohibitions.  The Department represents in its most recent filing that since the hearing it has processed all product submissions between July 1 and July 17, 2024.  [ECF No. 43-1 ¶ 46].

In response, Plaintiffs submitted multiple affidavits that seek to establish that the Hemp Amendments have been arbitrarily enforced.  Of course, "discriminatory enforcement does not necessarily mean that the ordinance that is being enforced is itself void-for-vagueness.  The most clearly stated law against running red lights conceivably could be enforced discriminatorily by the police, if they so choose."  *Diversified Numismatics, Inc. v. City of Orlando, Fl.*, 949 F.2d 382, 387 (11th Cir. 1991).  An affidavit from one Plaintiff extensively details issues she perceives regarding the Department's approvals and denials in the past few weeks.  Her attestations establish, at best, inconsistent and occasional incorrect applications of the Department's rules.  [ECF No. 38-2 at 5].  These allegations do not support a violation of the United States Constitution.  *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) (holding the Due Process Clause is not implicated by a negligent act by a government official).  In fact, Plaintiffs' own affirmations indicate that some of the denied products did not violate the Hemp Amendments and the Final Rules.  [ECF No. 38-2 ¶ 17].  The fact that some products were denied even though they "have no THC in them whatsoever" does not establish that the law is unconstitutionally vague.  Rather, to the extent the allegation is accurate, it demonstrates an improper application of state administrative rules for a state law by a state agency.  The crux of the issue is not whether the law can be arbitrarily enforced, but whether the language is sufficiently clear so as not to invite arbitrary enforcement.  The

language in the Hemp Amendments, in conjunction with the Final Rules, sets standards which "provide[] minimal guidelines to govern law enforcement," such that it does not encourage arbitrary enforcement. *St. Croix Waterway Ass'n v. Meyer,* 178 F.3d 515, 521 (8th Cir. 1999) (citation omitted).   The Due Process Clause does not allow individuals to obtain injunctive relief in a federal court if a state agency improperly applies its own rules.

The Court shares Plaintiffs' sentiments about the less than ideal rollout and early administration of the Hemp Amendments.  However, in light of the promulgation of the Final Rules by the Department, they cannot demonstrate that they are more likely than not to establish a due process violation arising from unconstitutional vagueness.

### b.  Void

Plaintiffs' assert a different due process challenge where they contend that the Hemp Amendments are "void" as-applied to them.  They argue that the law only provided them six weeks to comply with its terms.  The constitutional basis for this claim is unclear.  Although it appears to sound in due process, Plaintiffs do not advance an argument grounded in a specific constitutional provision which they claim is violated.  The sole case citation in their brief is to *Texaco, Inc. v. Short*, 454 U.S. 516 (1982).

In *Texaco*, the Supreme Court considered a challenge to an Indiana law which purported to extinguish mineral rights to land within the state if those mineral rights had not been exercised within the past 20 years.  The Supreme Court held that the law did not violate due process before extinguishing a property right because landowners were afforded a two-year period to file a statement of claim on the mineral interest.  *Id.* at 518.  If a landowner did not do so, the mineral rights would revert to the existing surface owner of the property.  In its discussion, the *Texaco* court explained that, in general, "a legislature need do nothing more than enact and publish the

law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." *Id*. at 532. The court went on to say that it was "settled that the question whether a statutory grace period provides an adequate opportunity for citizens to become familiar with a new law is a matter on which the Court shows the greatest deference to the judgment of state legislatures." *Id*. The two-year period included in the law at issue in *Texaco* was sufficient to allow property owners an opportunity to familiarize themselves with the statutory requirements and take appropriate action to protect their property interests.

Plaintiffs here argue that the six weeks between the enactment of H.F. 2605 and its effective date is insufficient to comply with its provisions. Where the Indiana law in *Texaco* contained a two-year grace period, proprietors such as Plaintiffs have only a fraction of the time. They emphasize that H.F. 2605 requires new packaging, new container sizes, and new notices. Plaintiffs argue it is "absurd" to expect companies to change their business in the manner required by the Hemp Amendments in such a short period of time.

The timeframe between the enactment of the Hemp Amendments and their effective date was indeed compressed. However, in the same vein as their Takings Clause challenge analyzed below, Plaintiffs appear to conflate their "property" interest in manufacturing and selling a certain product with the interests in real property recognized under law. The two-year grace period discussed in *Texaco* was a determination by the Indiana legislature to allow persons with economic interests in real property an extended period of time to take action before the property interest was extinguished. The affected persons in that case were very likely to be disengaged with their property rights because they had not exercised their interests in at least 20 years. More to the point, that was a "judgment" of the state legislature, which the Supreme Court held was entitled to "the greatest deference." *Id*. at 532.

The issues in this case are entirely different.  First, Plaintiffs do not identify any recognized property right to manufacture and sell any consumer product they desire.  Accordingly, it is difficult to discern how they were deprived of life, liberty, or property because of the law.

Second, Plaintiffs misconstrue what it means that they must be afforded an opportunity to comply with the Hemp Amendments.  By its terms, the new law provides that any non-conforming product sold after July 1, 2024 will be deemed a controlled substance under state law.  Therefore, in order to comply with the Hemp Amendments, Plaintiffs must not sell, possess, manufacture . . . any product that does not conform to the law.  They do not assert that it is impossible for them to cease engaging in this conduct within a six-week period.  Rather, they argue that it is devastating to their businesses, which they operated in reliance on the previously legal status of these products. [ECF No. 10 at 18] (opining that it is "absurd to expect a business that has been operating for years—with the consent of the federal and Iowa governments—to be able to change their business models, plans, and products in a [matter] of weeks").  Plaintiffs aver that non-conforming products constitute upwards of 90% of their existing inventory.  *See* [ECF Nos. 10-1–10-8].

Although the harsh detrimental impact of this legislation on Plaintiffs is not lost on the Court, Plaintiffs do not establish a likelihood that it violates the Due Process Clause.  Their position that due process is violated by the short grace period is not an argument that it is necessary to strictly comply with the Hemp Amendments, it is essentially a claim of what would be better for their businesses.  This is distinct from *Texaco* where the law at issue contained a procedure for affected persons, requiring them to take affirmative action in order to protect their property rights. *Texaco, Inc.*, 454 U.S. at 518 (providing that a mineral interest that is unused for 20 years will automatically lapse and revert to the surface property owner "unless the mineral owner files a statement of claim in the loc county recorder's office").  In this case, the Hemp Amendments do

not *require* Plaintiffs to take any affirmative action.  Products sold by Plaintiffs were deemed controlled substances as of July 1, 2024, regardless of any action taken by them.  Wise or unwise, the Iowa legislature believes that non-conforming products are unsafe, injurious to the public health, or otherwise.  Plaintiffs have not sufficiently demonstrated a likelihood that the Due Process Clause requires the legislature to allow these products to remain on the market until their businesses have reconfigured or their existing inventory has been exhausted.

### 3.   Dormant Commerce Clause

Plaintiffs allege that the Hemp Amendments are also a violation of Congress's commerce power, as effective through the constitutional doctrine known as the dormant Commerce Clause. The Commerce Clause is set forth in Article I, where it grants Congress the power "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  Although the Commerce Clause is written as a positive grant of power to Congress, it has long been interpreted by the Supreme Court to prohibit state laws that unduly restrict interstate commerce.  *Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542, 548–49 (2015).  In other words, "dormant Commerce Clause is the negative implication of the Commerce Clause: states may not enact laws that discriminate against or unduly burden interstate commerce."  *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003) (citing *Quill Corp. v. North Dakota*, 504 U.S. 298, 312 (1992)). Accordingly, it is impermissible under the Commerce Clause to enforce state laws that are motivated by "economic protectionism" through regulations "designed to benefit in-state economic interests by burdening out-of-state competitors."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (citation omitted).

A state law will violate the dormant Commerce Clause if it: (1) "clearly discriminates against interstate commerce in favor of in-state commerce," (2) "imposes a burden on interstate

commerce that outweighs any benefits received," or (3) "has the practical effect of extraterritorial control on interstate commerce." *Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009) (citations omitted).

Step one of the dormant Commerce Clause analysis is "whether the challenged law discriminates against interstate commerce." *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006). "Under the dormant Commerce Clause, a law is discriminatory if it benefits in-state economic interests while also inordinately burdening out-of-state economic interests." *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020). Importantly, the Commerce Clause is not "intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997) (citation omitted).

The Hemp Amendments do not grant differential treatment to in-state companies over out-of-state companies. Plaintiffs acknowledge—if anything—the law discriminates against in-state interests. This presents no evidence of discriminatory intent or economic protectionism. "[A]bsent purposeful discrimination, 'a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens." *Ross*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1879)). Accordingly, the state may regulate consumable hemp products stringently within its borders for the benefit of the health and safety of Iowa citizens as delineated in the Hemp Amendments without running afoul of the dormant Commerce Clause.

Another way that a law violates that dormant Commerce Clause is if it has a practical effect of controlling interstate commerce extraterritorially. *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (holding that the Commerce Clause "precludes the application of a state statute to commerce that

takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."). The *Healy* court found that a law that directly controls wholly out-of-state commerce "is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id*. Plaintiffs have not established that the Hemp Amendments operate in this unconstitutional manner.

The final version of a dormant Commerce Clause violation is where state legislation imposes burdens on interstate commerce (without discriminatory application) disproportionate to the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). State legislation is consistent with the dormant Commerce Clause if "the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental." *Id*. If so, the law is valid "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id*.

Plaintiffs argue that the Hemp Amendments burden interstate commerce in a way that exceeds the local benefits. They argue that the packaging and labeling requirements in the Hemp Amendments "are the beginning of a slippery slope" because if other states enacted similar laws, the flow of consumable hemp products would cease. [ECF No. 2 at 20–21]. The purpose of the Hemp Amendments, according to Plaintiffs, was to "protect minors from dangerous and intoxicating products." *Id*. at 21. Acknowledging that keeping certain products out of the hands of minors "is certainly a purpose that should be considered," Plaintiffs contend that it should not supersede the interests of the consumable hemp industry. *Id*. (urging that protecting minors "must be executed in a manner that will not have the ultimate chilling effect of eliminating the entire consumable hemp industry from Iowa.").

Plaintiffs' position on the goals, and related benefits, of the Hemp Amendments does not stand up to scrutiny.  They are correct that if protection of minors was to only goal of the law, then many of the provisions are overly restrictive.  But that was plainly not the only consideration of the legislature, and Plaintiffs' selective citations to public statements by the Governor and certain legislators do not invalidate the law.  It is undeniable that the state of Iowa wanted to restrict the potency of consumable hemp products because it became clear that a 0.3% THC limit on a dry weight basis was not an effective limitation for these products.  That is precisely what the state did when it implemented the potency provision in H.F. 2605.  It has properly effectuated that purpose, no matter how frustrating it is to Plaintiffs' businesses.

Furthermore, Plaintiffs argue that the Hemp Amendments were enacted for a different illegitimate local purpose—to restrict the sale of consumable hemp products in favor of the medical cannabis industry in Iowa.  They contend that this purpose is "pervasively demonstrated" in the legislative history and public testimony on it.  Plaintiffs argue that protecting one industry over another is not a legitimate local purpose and "instead only serves to entirely eliminate the consumable hemp market in Iowa to the detriment of Iowans" who do not qualify for the medical cannabis program, do not benefit from the products, or cannot afford to purchase the products that are available under the program.  *Id*. at 22.

At the hearing, Plaintiffs explained that this was not a legitimate local purpose because it was "economic protectionism" which can never be a legitimate governmental purpose.  [ECF No. 34 at 21].  This argument fails.  First, there is no indication that this "economic protectionism" touches upon interstate commerce at all, much less substantially interferes with it.  Intrastate legislation favoring one local industry over another has no implications of protectionism for the

benefit of Iowa to the detriment of interstate commerce. In the most generous reading of Plaintiffs' argument, they have only half of a dormant Commerce Clause claim.

Second, Plaintiffs do not establish this is an illegitimate purpose. By their own admission, Plaintiffs do not participate in the medical cannabis program and do not receive protections under the law. [ECF No. 34 at 21]. Nevertheless, they wish to sell similar products because some consumers do not receive relief from products available under the medical cannabis program. To obtain products under that program, a patient must be recommended by a health care practitioner. *See* Iowa Code § 124E.3(1) (setting forth the process for a provider to recommend a patient for the medical cannabis program). A patient must then submit extensive personal information in order to receive a registration card. *Id.* § 124E.4. The medical cannabis program is overseen by a board that is composed of eight medical practitioners. *Id.* § 124E.5(1)(a). The statutory scheme contains further requirements for manufacturers and dispensaries. *Id.* §§ 124E.6–124E.9.

That statutory framework demonstrates that, in the judgment of the Iowa legislature, the provision of cannabis products for medical purposes requires strict oversight. Obviously, many other states have come to different conclusions regarding the lawful availability of cannabis. *See, e.g.,* Cal. Health & Safety Code § 11362.1; Colo. Rev. Stat. tit. 44, art. 10; Mass. Gen. Laws, ch. 94G, § 7. Plaintiffs do not establish that the regulation of consumable hemp products used as a substitute for those obtained through the medical cannabis program is illegitimate. It certainly does not transgress the dormant Commerce Clause.[1]

---

[1] Plaintiffs argue that the lack of an exemption for transportation as required by the Farm Bill also violates the dormant Commerce Clause. For the same reasons Plaintiffs would lack standing to bring the express preemption claim, they cannot maintain a claim that the regulations unconstitutionally burden interstate commerce. Plaintiffs have not established an injury which could be remedied on these grounds because they do not engage in the allegedly burdened interstate conduct.

4.   Takings

Plaintiffs also allege that the Hemp Amendments violate the Takings Clause of the Fifth Amendment.  They contend that just compensation is required because the law deprives them of all economically beneficial use of their property and also fails to pass the balancing test applied to regulatory takings.  Defendants respond that the Hemp Amendments do not effect a taking for Fifth Amendment purposes because a law enacted pursuant to a state's police power for the purpose of public health and safety is not a taking of private property for public use.

a.   Takings Clause

The Fifth Amendment prohibits the government from taking "private property" for "public use" without paying the property owner "just compensation."  U.S. Const. amend. V.  The Takings Clause applies to the states through the Fourteenth Amendment.  *Chi., Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 235–36 (1897).

The Takings Clause applies "to a direct appropriation of property—personal or real." *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (citation omitted).  In addition to direct appropriation of property, a restriction on the use of property is considered a regulatory taking if it goes "too far."  *Id.*  Regardless of the method of taking, the Constitution requires just compensation for the property owner.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021) ("The government must pay for what it takes.").  The analysis to determine whether a constitutional taking has occurred entails an "ad hoc, factual inquiry."  *Glosemeyer v. Mo.-Kan.-Tex. R.R.*, 879 F.2d 316, 324 n.8 (1989) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)).

To bring a claim under the Takings Clause, Plaintiffs must identify property interests protected by that constitutional provision.  *Monsanto Co.*, 467 U.S. at 1001–03.  The Takings

Clause does not define what constitutes property, so "existing rules or understandings" are drawn on to determine any property interest. *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (explaining that "the Constitution protects rather than creates property interests"); *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (describing property interest as "defined by existing rules or understandings that stem from an independent source such as state law-rules or understanding that secure certain benefits and that support claims of entitlement to those benefits.").

Plaintiffs contend that they have protectable property interests in their product inventory and their businesses. A business has been recognized as property within the scope of the Takings Clause. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949). Tangible property such as Plaintiffs' product inventory is also a protectable property interest. *Andrus v. Allard*, 444 U.S. 51, 66 (1979).

Plaintiffs must next establish that a taking has occurred, which does not automatically include any loss in property. *Armstrong v. United States*, 364 U.S. 40, 48 (1960) ("[N]ot every destruction or injury to property by government action has been held to be a 'taking' in the constitutional sense."). It is also not enough to establish a taking through mere diminution of property value. *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690, 695 (8th Cir. 1996). Constitutional takings come in two forms: (1) a *per se* taking, which involves the "direct government appropriation of or physical invasion of private property;" or (2) a regulatory taking, where a regulation affecting private property "goes too far." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537–38 (2005) (citation omitted). It is undisputed that there was no "permanent physical invasion" of Plaintiffs' property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 429 (1982).

However, Plaintiffs argue that the Hemp Amendments constitute both a *per se* regulatory taking and a regulatory taking that goes "too far."  First, they contend that the new law deprives them of all economic use of their property, meaning that it is a *per se* regulatory taking not subject to a balancing test.  *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1017 (1992).  Plaintiffs also maintain that the Hemp Amendments are a regulatory taking that goes "too far" under the *Penn Central* balancing test.  *See Penn Cent. Transp. v. New York City*, 438 U.S. 104 (1978).  The Court rejects both of these takings arguments for the reasons discussed below.

In *Lucas*, the Supreme Court held that a regulatory taking occurred when property use regulations resulted in a total deprivation of the economic use of a landowner's property.  *Lucas*, 505 U.S. at 1017.  According to Plaintiffs, the decision in *Lucas* established a categorical rule that any deprivation is a *per se* taking when a property owner is "called upon to sacrifice all economically beneficial uses in the name of the common good."  *Id*. at 1019 (emphasis omitted).  In such a situation, the balancing of the public purpose is not required, no matter "how weighty."  *Id*. at 1015.

Their position is inconsistent with subsequent case law, which has applied *Lucas* only to real property in very narrow situations.  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007); *Outdoor Graphics*, 103 F.3d at 694; *see also Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 674 (3d Cir. 1999) ("To date, the [*Lucas*] categorical approach has only been used in real property cases.").  Plaintiffs do not identify any case where the *Lucas* standard was applied to personal property.  The only cases cited involve real property.

Plaintiffs argue that the Hemp Amendments are a regulatory taking, which is "a restriction on the use of property that [goes] too far."  *Horne*, 576 U.S. at 360; *see also Cedar*

*Point Nursery*, 594 U.S. at 148 (describing a regulatory taking as "[w]hen the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property."). A regulatory taking is a regulatory action that is the functional equivalent of a physical taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

When determining whether a use restriction qualifies as a taking, courts consider the economic impact of the regulation, the interference with reasonable investment-backed expectations, and the character of the regulation. *Penn Cent. Transp. Co.*, 438 U.S. at 124.

Plaintiffs have not established that they had "reasonable investment-backed expectation" that they would be able to continue selling their products without any further restriction. *Hawkeye Commodity Promotions*, 486 F.3d at 442 (holding that reasonable investment expectations must be more than "a unilateral expectation or an abstract need") (citation omitted). Other districts courts have rejected similar takings claims by plaintiffs challenging state regulation of consumable hemp. *See Hemp Quarters 605 LLC v. Noem*, 3:24-CV-03016-ECS, 2024 WL 3250461, at *1 (D. S.D. June 29, 2024); *AK Indus. Hemp Ass'n v. Alaska Dep't of Nat. Res.*, Case No. 3:23-cv-00253-SLG, 2023 WL 8935020, at *6 (D. Alaska Dec. 27, 2023). This failure to show reasonable investment-backed expectations is fatal under *Penn Central*.

Notwithstanding that failure under the *Penn Central* balancing test, there is another reason why Plaintiffs cannot maintain a takings claim. The Supreme Court has long held that legislation enacted pursuant to a state's police powers to address matters "injurious to health, morals, or safety of the community cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887); *cf. Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (concluding that "the government may not be required to compensate an

owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain"). Thus, as an exercise of the state's police powers, the Hemp Amendments do not constitute a taking of property for the public benefit.

### C. Remaining Injunction Factors

In light of Plaintiffs' failure to establish a likelihood of success on any of the claims properly asserted in their Complaint, it is unnecessary to analyze the remaining factors for a preliminary injunction.

### III.    CONCLUSION

For the reasons discussed above, Plaintiffs have not established that they are likely to succeed on the merits of their claims. Accordingly, a preliminary injunction is improper. The Motion for Preliminary Injunction is DENIED. [ECF No. 2].

IT IS SO ORDERED.

Dated this 25th day of July, 2024.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT